# EXHIBIT A

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

JASON CAMPBELL and
SARAH SOBEK, individually,
and on behalf of all other
similarly situated current
and former employees of
PricewaterhouseCoopers, LLP,,

                                    NO. CIV. S-06-2376 LKK/GGH

         Plaintiffs,

    v.

PRICEWATERHOUSECOOPERS, LLP,              **O R D E R**
a Limited Liability Partnership;,
and DOES 1-100, inclusive,

         Defendant.
_____/

    This is a wage and hour action brought by plaintiffs Jason

Campbell and Sarah Sobek individually and on behalf of other

similarly situated individuals against defendant

PricewaterhouseCoopers LLP ("PwC"). Plaintiffs allege that PwC

misclassified them as exempt employees under California law and

failed to pay them overtime and other benefits that an employer

would normally be required to provide to non-exempt employees.

Pending before the court is plaintiffs' motion for class

1

1  certification.[1]    For the reasons explained below, the court

2  provisionally grants the motion with respect to a class comprised

3  of associates in PwC's Attest division.

### I. Factual Background

**A. General Background**

6      Defendant PricewaterhouseCoopers LLP ("PwC") is the largest

7  public accountancy partnership in the world.  Decl. of William

8  Kershaw, Ex. 3.  PwC has over 30,000 employees in its United States

9  offices, which currently include six California offices in Irvine,

10 Los Angeles, Sacramento, San Diego, San Francisco, and San Jose.

11 Decl. of Carl Overstreet ¶ 4.  The present suit only involves

12 employees in PwC's California offices.

13      PwC's organizational structure is complex and multi-tiered.

14 PwC's subdivision of its professional services begins with three

15 lines of service ("LOS"), which are Assurance, Tax, and Advisory.

16 Only Assurance and Tax are at issue in this action.  Each line of

17 service is then further divided into divisions.  Overstreet Decl.

18 ¶ 3.  The divisions within each line of service may focus on

19 specialized services, such as external audits, transaction

20 structuring (e.g., mergers and acquisitions, deals), information

21 technology, or consulting work.  Id.

22      There are several personnel job titles within PwC.  These

23 include associate, senior associate, manager, senior manager,

24

25      [1] Plaintiffs seek to certify a class under Federal Rule of
    Civil Procedure 23(b)(3), which provides for an "opt out" class
    action as opposed to an "opt in" class action.  Cf. 29 U.S.C. §
26  216(b) (Fair Labor Standards Act).

1    director, managing director, and partner, Decl. of Jason Campbell

2    ¶ 4; Decl. of Sarah Sobek ¶ 4, with partners generally exercising

3    the greatest authority within PwC's organizational structure.

4    Plaintiffs contend that while PwC requires employees in the

5    positions of manager, senior manager, director, managing director,

6    and partner to hold a Certified Public Accountant ("CPA") license,

7    Campbell Decl. ¶ 5; Sobek Decl. ¶ 5, employees in the positions of

8    associate or senior associate need not be so licensed.

9        The named plaintiffs in this action, Jason Campbell and Sarah

10   Sobek, worked as associates in the Assurance line of service.

11   Campbell Decl. ¶ 2; Sobek Decl. ¶ 2. The proposed class, however,

12   consists of all unlicensed associates and senior associates who

13   worked for PwC in its Assurance and Tax lines of service in

14   California from October 27, 2002 to the present date. Plaintiffs

15   seek to certify the following class:

16        All persons employed by PricewaterhouseCoopers LLP in
          California, from October 27, 2002 until the time when
17        class notice may be given, who: (1) assisted certified
          public accountants in the practice of public
18        accountancy, as provided for in California Business
          and Professions Code sections 5051 and 5053, (2)
19        worked as associates or senior associates in the
          assurance and tax lines of service, (3) were not
20        licensed by the State of California as certified
          public accountants during some or all of this time
21        period, and (4) were classified as exempt employees.

22   **B. Assurance and Tax Lines of Service**

23       Assurance and Tax are PwC's two largest lines of service.

24   Kershaw Decl., Ex. 3. PwC serves two classes of clients: audit and

25   non-audit (or, in PwC's nomenclature, Channel 1 and Channel 2

26   clients). Overstreet Decl. ¶ 7. For audit clients, PwC provides

3

1   external auditing and financial reporting services in addition to

2   other limited services.  Id.  For non-audit clients, PwC provides

3   consulting services but no auditing or financial reporting

4   services.  Id.  This distinction is said to ensure an arm's length

5   relationship between PwC and its audit clients.

6       There are three divisions within the Assurance line of service

7   in California: Attest, Systems Process Assurance ("SPA"), and

8   Transaction Services.  Attest provides financial statement and

9   internal control audits, and only serves audit clients, id. ¶¶ 7-8,

10  while SPA provides services related to information technology

11  ("IT") management controls.  Decl. of Michael Corey ¶ 6.  SPA

12  services include reviews of database security controls and

13  infrastructure security.  Id. ¶ 5.  Finally, Transaction Services

14  advises clients on such transactions as mergers and acquisitions

15  and initial public offerings.  SPA and Transactional Services both

16  serve audit and non-audit clients.  Decl. of Curt Moldenhauer ¶¶

17  5, 7; Corey Decl. ¶ 6.

18      Tax contains a greater number of divisions than Assurance.

19  These include divisions such as International Tax Services, Private

20  Company Services, and State and Local Tax.  Decl. of Margaret

21  Barron ¶ 4.  The services provided by Tax include tax estimate and

22  tax return preparation for a variety of entities, Decl. of Jacquie

23  Wilson ¶ 7; Decl. of Brian Hunt ¶ 8; Decl. of Joseph Hillsted ¶ 5,

24  advice on compliance with the Internal Revenue Code and

25  international tax treaties, Decl. of Paul Klopping ¶ 6, and review

26  of tax-related entries in quarterly and year-end reports, Decl. of

1  Angela Lam ¶ 8.  Tax serves both audit and non-audit clients.

2  Barron Decl. ¶ 5.

3  **C. Recruiting, Education, and Training**

4      PwC recruits candidates from a variety of backgrounds for its

5  various positions.  PwC employs on-campus recruiting, targeting

6  students graduating in the near future, and experienced recruiting,

7  targeting individuals who have already worked at accounting and

8  professional services firms.  Barron Decl. ¶ 7.  PwC also recruits

9  internally.  Moldenhauer Decl. ¶ 9.

10      Educational background is sometimes a factor in recruiting.

11  Id. at ¶ 10.  For example, preferred candidates for Attest and Tax

12  either hold a degree in accounting or the requisite number of

13  college courses enabling that candidate to sit for the CPA exam.

14  Overstreet Decl. ¶ 11; Barron Decl. ¶ 8.  PwC also generally

15  requires that SPA candidates hold a bachelor's or master's degree

16  in Accounting, Finance, or Computer Science.  PwC, however, may

17  also hire recent college graduates with little or no prior work

18  experience.  Moldenhauer Decl. ¶ 12; Campbell Dep., Ex. 1 (resume);

19  Sobek Dep., Ex. 1 (resume).

20      PwC requires a minimum 40 to 150 hours of annual training for

21  Tax associates and senior associates.  Decl. of Keith Larson ¶ 7.

22  Nevertheless, prior work experience or a previous internship with

23  PwC may decrease the amount of training required for an employee.

24  Decl. of Daniel Goepp ¶ 10.  In addition, training and continuing

25  education requirements vary between lines of service and between

26  divisions.  For example, training offered to new employees in the

1  Attest division may focus on the risk assessment and analytical

2  procedures used in audits, while Tax training may include technical

3  issues associated with tax and simulations focusing on client

4  interaction.  Id.; Larson Decl. ¶¶ 7-12.

5  **D. Duties of Associates and Senior Associates**

6      PwC employed Campbell for a year, from August 2005 to August

7  2006, and employed Sobek for slightly less than two years, from

8  August 2004 to June 2006.  Campbell and Sobek both characterize

9  their job duties as primarily assisting CPAs in performing audits.

10 Campbell Decl. ¶ 2; Sobek Decl. ¶ 2.  Both claim that their job

11 duties on audits involved verifying financial statement items by

12 obtaining and reviewing the underlying documentation that supported

13 the items.  Campbell Decl. ¶¶ 6-7; Sobek Decl. ¶¶ 6-7.  Campbell

14 and Sobek both maintain that they worked in excess of eight hours

15 per day and worked on weekends and holidays without overtime pay.

16 Campbell Decl. ¶ 12; Sobek Decl. ¶ 12.

17      Plaintiffs also maintain that the scope of their duties were

18 necessarily constrained by two standards: (1) Section 5053 of the

19 California Business and Professions Code, which requires the

20 control and supervision of unlicensed accountants, and (2) the

21 professional standards set by the American Institute of Certified

22 Public Accountants, which contain a similar directive.  Plaintiffs

23 allege that PwC's compliance with these rules is evidenced in their

24 policies regarding who is allowed to sign various documents,

25 letters, and reports.

26      PwC has submitted approximately fifty declarations from

1   individuals in a wide array of positions at PwC (e.g., from

2   associates and senior associates to managers and partners) and from

3   various divisions within both the Assurance and Tax lines of

4   service. They demonstrate not insignificant variations in the type

5   of work performed by division and by line of service. They show

6   that the work of the SPA division within Assurance, for example,

7   is centered around information technology (IT). Decl. of Irina

8   Majstrova ¶ 5. Similarly, they show that looking across lines of

9   service, Tax associates spend most of their time on the

10   significantly different task of preparing tax returns or tax

11   estimates. Decl. of Jesse Dang ¶ 7; Decl. of Jacquie Wilson ¶ 7

12   (80% of time spent on tax returns). One associate stated that

13   "[i]t is difficult to compare the job duties of, for instance, a

14   SPA Senior Associate with those of an Associate in the Tax line of

15   service because the nature and purpose of the duties are entirely

16   different." Dang Decl. ¶ 7.

17      In addition, there are said to be significant differences

18   between the work performed by associates and senior associates,

19   because one of the primary duties of senior associates is to

20   supervise associates. See, e.g., Decl. of Joseph Gomez ¶ 11 ("When

21   I became a Senior Associate, I spent about 50% to 60% of my time

22   reviewing the work of other Associates."). The degree of

23   supervision is limited by, inter alia, the legal and professional

24   standards that govern the accounting profession. As explained

25   below, however, whether the differences between associates and

26   seniors associates are material is a difficult issue, and not

1  without uncertainty.

2  ## II. Standard

3  A party seeking to certify a class must demonstrate that it

4  has met all four requirements of Rule 23(a) and at least one of the

5  requirements of Rule 23(b).  Zinser v. Accufix Research Inst.,

6  Inc., 253 F.3d 1180, 1186 (9th Cir. 2001).  Rule 23(a) allows a

7  class to be certified

8  > only if (1) the class is so numerous that joinder of
   > all members is impracticable, (2) there are questions
9  > of law or fact common to the class, (3) the claims or
   > defenses of the representative parties are typical of
10 > the claims or defenses of the class, and (4) the
   > representative parties will fairly and adequately
11 > protect the interests of the class.

12 In other words, the class must satisfy the requirements of

13 numerosity, commonality, typicality, and adequacy.

14 Rule 23(b) provides for three types of class actions.  Here,

15 plaintiff seeks to certify the class under Rule 23(b)(3), which

16 allows for a class to be certified if "the court finds that the

17 questions of law or fact common to the members of the class

18 predominate over any question affecting only individual members,

19 and that a class action is superior to other available methods for

20 the fair and efficient adjudication of the controversy."  Fed. R.

21 Civ. P. 23(b)(3).

22 The matters pertinent to the findings include:

23 > (A) the interest of members of the class in
   > individually controlling the prosecution or defense of
24 > separate actions; (B) the extent and nature of any
   > litigation concerning the controversy already
25 > commenced by or against members of the class; (C) the
   > desirability or undesirability of concentrating the
26 > litigation of the claims in the particular forum; and

(D) the difficulties likely to be encountered in the management of a class action.

Id.

The court must conduct a "rigorous analysis" of the moving party's claims to examine whether the requirements are satisfied, Gen. Tel. Co. of Southwest v. Falcon, 457 U.S. 147, 161 (1982). Generally, however, the court should not consider whether the party seeking class certification has stated a cause of action or is likely to prevail on the merits.  Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 178 (1974).  Nevertheless, the court is not only "'at liberty to' consider evidence which goes to the requirements of Rule 23" but in fact is required to consider such evidence, "'even [if] the evidence may also relate to the underlying merits of the case.'"  Dukes v. Wal-Mart, 509 F.3d 1168, 1178 n.2 (9th Cir. 2007) (quoting Hanon v. Dataproducts Corp., 976 F.2d 497, 509 (9th Cir. 1992)).  If the court concludes that the moving party has met its burden of proof, the court has broad discretion to certify the class.  Zinser, 253 F.3d at 1186.

### III. Analysis

#### A. Ascertainability of Class

Separate from the requirements under Rules 23(a) and (b), and as a threshold to their analysis, defendant argues that plaintiffs have failed to propose an ascertainable class.

An adequate class definition specifies "a distinct group of plaintiffs whose members [can] be identified with particularity." Lerwill v. Inflight Motion Pictures, Inc., 582 F.2d 507, 512 (9th

1   Cir. 1978).  One of the primary purpose of the class definition is

2   to make it "administratively feasible" for the court to determine

3   individual class membership.  Aiken v. Obledo, 442 F. Supp. 628,

4   658 (E.D. Cal. 1977).   The class definition should therefore

5   provide the court with objective criteria to discern the class's

6   members.  See O'Connor v. Boeing N. Am., Inc., 197 F.R.D. 404, 416

7   (C.D. Cal. 2000).   Such criteria may include, for example, a

8   defendant's own actions and the damages caused by such actions,

9   Int'l Molders' & Allied Workers' Local Union No. 164 v. Nelson, 102

10  F.R.D. 457, 464-65 (N.D. Cal. 1983), or even just geographical

11  boundaries, Berlowitz v. Nob Hill Masonic Mgmt., 1996 WL 724776,

12  at *5 (N.D. Cal. Dec. 6, 1996).

13      Nevertheless, the class definition may not consider the merits

14  of the action in determining individual class membership.   See

15  Eisen, 417 U.S. at 177-78; Moore v. Hughes Helicopters, Inc., 708

16  F.2d 475, 480 (9th Cir. 1983); Hagen v. City of Winnemucca, 108

17  F.R.D. 61, 63-64 (D. Nev. 1985) (finding definition of class

18  insufficient when it involved violations of proposed members'

19  constitutional rights).

20      Defendant's attack on plaintiffs' motion stems from

21  plaintiffs' partial reliance on two statutes to define the class.

22  The proposed class would include individuals who "assisted

23  certified public accountants in the practice of public accountancy,

24  as provided for in California Business and Professions code

25  sections 5051 and 5053."  Section 5051 defines seven acts that are

26  deemed as the "practice of public accountancy," including holding

1 oneself out to the public as skilled in public accountancy,

2 maintaining an office for the business of a public accountant, and

3 offering to perform certain services such as an audit for

4 compensation. Section 5053 states that nothing shall preclude an

5 individual who is not certified as an accountant from assisting one

6 who is, so long as the former is under the control and supervision

7 of the latter.

8      Defendant argues that plaintiffs' reliance of these statutes

9 makes it difficult to discern who should be included in the class.

10 For instance, defendant argues that some of the categories of work

11 in Section 5051 are nonsensical in this context (e.g., they argue

12 that a PwC associate cannot "assist" a CPA in holding himself or

13 herself out to the public as one skilled in public accountancy, or

14 "assist" a CPA in maintaining an office for his or her business).

15 The argument does not lie. It is far from clear that the proposed

16 ambiguities exist. Just as a matter of common sense, by assisting

17 the licensed accountant, the employees accomplish the tasks

18 enumerated in the statute, and attacked by defendant.

19      Even if the court were to agree that incorporation of these

20 two statutes into the class definition introduces an element of

21 ambiguity, courts retain the discretion to alter an inadequate

22 class definition. See Lamumba Corp. v. City of Oakland, 2007 WL

23 3245282, at *5 (N.D. Cal. Nov. 2, 2007); Hagen, 108 F.R.D. at 64

24 (altering definition to remove condition of constitutional

25 violation). Accordingly, the court could strike the reference to

26 Sections 5051 and 5053 from the class definition, although it

1    appears to the court unnecessary.  In any event, defendant does not

2    challenge the remainder of the class definition, which is

3    sufficiently definite, ascertainable, and administratively

4    feasible.

5    **B. Requirements under Rule 23(a)**

6        As noted, Rule 23(a) lists the prerequisites for a class

7    action.  These requirements are (1) the impracticability of joining

8    all members ("numerosity"); (2) the existence of common questions

9    of law or fact ("commonality"); (3) typicality of the claims and

10   defenses of the parties with respect to the proposed class

11   ("typicality"); and (4) adequate representation of the proposed

12   class by the parties before the court ("adequacy of

13   representation").  Fed. R. Civ. P. 23(a); see also Stanton v.

14   Boeing Co., 327 F.3d 938, 953 (9th Cir. 2003).

15           **1. Numerosity**

16       Rule 23(a)(1)'s requirement that an attempt to join all

17   parties be "impracticable" does not equate to "impossible."  See

18   Fed. R. Civ. P. 23(a)(1); Harris v. Palm Springs Alpine Estates,

19   Inc., 329 F.2d 909, 913-14 (9th Cir. 1964).  Instead, an attempt

20   to join all parties must only be difficult or inconvenient.

21   Harris, 329 F.2d at 913-14.  Although impracticability does not

22   hinge only on the number of members in the putative class, joinder

23   is usually impracticable if a class is "large in numbers."  Jordan

24   v. Los Angeles County, 669 F.2d 1311, 1319 (9th Cir. 1982), vacated

25   on other grounds, 459 U.S. 810 (1982).  While there is no set

26   number of members required, courts have generally found classes

1   numbering in the hundreds to be sufficient to satisfy the

2   numerosity requirement.  See, e.g., Gay v. Waiters' & Dairy

3   Lunchmen's Union, Local No. 30, 549 F.2d 1330, 1332-34 (9th Cir.

4   1977) (reversing district court's finding that 184 potential

5   members is insufficient to fulfill Rule 23(a)(1)'s requirements);

6   Sagers v. Yellow Freight Sys., Inc., 529 F.2d 721, 734-35 (5th Cir.

7   1976) (holding class of approximately 110 members satisfied

8   numerosity requirement); see also James Wm. Moore, Moore's Federal

9   Practice § 23.22[1][b] (Daniel R. Coquillete et al. eds., 3d ed.

10  2007) (noting forty-one or more members is "usually sufficiently

11  numerous").

12      Here, plaintiffs contend that they anticipate a class

13  numbering over one thousand members.  Kershaw Decl. at ¶ 12.

14  Defendant does not challenge that the numerosity requirement is

15  met.  The court therefore finds that plaintiffs have satisfied the

16  numerosity requirement.[2]

17      **2. Commonality**

18      Commonality exists when "there are questions of law or fact

19  common to the class."  Fed. R. Civ. P. 23(a)(2).  Rule 23(a)(2)

20  does not require that every or all questions of fact or law be

21  common or identical.  Hanlon v. Chrysler Corp., 150 F.3d 1011, 1019

22  (9th Cir. 1998).  Rule 23(a)(2) is also more lenient than the

23  related requirement under Rule 23(b)(3) that common questions of

24  law or fact predominate.  Id.  In other words, common questions

25  ────────────────

26      [2] This remains true even if the class were limited to Attest
    associates.

13

1    exist; but they need not be the predominant questions in the case.

2    Id.  Commonality may exist where there is a common legal issue with

3    varied factual predicates, or where there is a common factual basis

4    with varied legal remedies.  Id. at 1019-20.

5        Here, plaintiffs have adequately pled common questions of law

6    or fact.  Common legal questions include whether a license is

7    required to satisfy the professional exemption, whether assistants

8    to licensed accountants may exercise discretion and independent

9    judgment under the laws and professional standards governing

10   accounting, and which duties performed by the class members, to the

11   extent they are shared, should be classified as exempt.  Common

12   factual questions include whether defendant implemented policies

13   and procedures requiring the supervision of class members.  These

14   questions are similar to those that other courts have found

15   sufficient to constitute common questions of law or fact for

16   purposes of Rule 23(a)(2).  See, e.g., Sepulveda v. Wal-Mart

17   Stores, Inc., 237 F.R.D. 229, 242 (C.D. Cal. 2006).  Accordingly,

18   the court finds that the requirement of commonality is satisfied.

19   **3. Typicality**

20       Typicality requires that "the claims or defenses of the

21   representative parties are typical of the claims or defenses of the

22   class."  Fed. R. Civ. P. 23(a)(3).  For typicality to be met,

23   plaintiffs need not possess identical claims to those of the

24   putative class members.  Hanlon, 150 F.3d at 1020.  Instead,

25   plaintiffs' claims need only be "reasonably coextensive" with the

26   claims of the putative class.  Id.  The inquiry focuses on the

14

1   claims themselves -- not the factual predicates from which the

2   claims arise.  <u>Hanon v. Dataprods. Corp.</u>, 976 F.2d 497, 508 (9th

3   Cir. 1992).  "The test of typicality 'is whether other members have

4   the same or similar injury, whether the action is based on conduct

5   which is not unique to the named plaintiffs, and whether other

6   class members have been injured by the same course of conduct.'"

7   <u>Id.</u>

8       Here, the named plaintiffs allege the same injury as that

9   allegedly suffered by the other class members, e.g., defendant's

10  failure to pay overtime, as a result of the same conduct by

11  defendants, i.e., misclassification.  Their legal claims (and the

12  corresponding statutory bases of such claims) are also the same as

13  those of the other class members.  For example, in addition to

14  failure to pay overtime, plaintiffs also allege that defendant

15  failed to provide meal periods in violation of California Labor

16  Code § 512(a), and failed to provide the statutorily defined

17  compensation for missed meal periods in violation of California

18  Labor Code § 226.7.[3]

19      Defendant contends, however, that plaintiffs' employment in

20  only a single division of a line of service precludes a finding of

21

22

23  _____

24      [3] Plaintiffs also allege violations of numerous other sections
    of the California Code, including sections 17200 of the Business
    and Professions Code and sections 203, 226, 510, 1174, and 1194 of
25  the Labor Code.  However, these violations are contingent upon a
    finding that plaintiffs were in fact misclassified as exempt
26  employees.

1  typicality.[4]  This argument is not without foundation.  See Kelley

2  v. SBC, Inc., 1998 U.S. Dist. LEXIS 18643, at *43 (N.D. Cal. Nov.

3  13, 1998) (limiting certification to positions plaintiffs actually

4  held).  Plaintiff responds that there need not be a named plaintiff

5  with respect to every possible job category.  See Stanton, 327 F.3d

6  938, 957 (9th Cir. 2003) (finding named plaintiffs to satisfy

7  typicality with respect to fifteen thousand putative class members,

8  even though plaintiffs did not represent "various sub-groups" of

9  class); Cornn v. United Parcel Services, Inc., 2005 WL 588431, at

10 *7 (N.D. Cal. 2005) (no need for separate class representative for

11 certain positions).

12     In Staton, however, there was a broad cross-section of thirty-

13 two named employee plaintiffs, which is not the case here.  327

14 F.3d at 957 ("'The named plaintiffs ... include a very broadly

15 selected cross-section of the different categories of Boeing

16 employees.  Salaried and hourly, management and line-worker, union

17 and non-union are all represented, as are each of the major

18 geographic hubs . . . and each of the pre-merger companies.'").

19 Additionally, in Cornn, the court found that there was no material

20 distinction between the positions that were represented and those

21 that were not.   2005 WL 588431, at *7.

22     The court finds that class certification is appropriate as to

23

24     [4] Defendant alternately argues that typicality is lacking
   because the named plaintiffs would be preoccupied with unique
25 defenses pertaining to their poor job performance, but they have
   failed to articulate how this performance impacts whether or not
26 they should have been classified as exempt.

16

1  the positions that plaintiffs actually held.  As noted below, this

2  issue might be better framed as a problem of predominance.

3  Regardless of how the issue is framed, the fact remains that

4  plaintiffs have virtually no knowledge of what associates in other

5  divisions do.  Moreover, based on the evidence submitted by PwC,

6  there appear to be significant differences between the work

7  required by an audit versus the work involved in securing a

8  client's IT infrastructure, or in creating tax provisions for a

9  trust.  In light of the such differences, the court finds that

10 certification is only appropriate to a class of Attest associates.

11     **4. Adequacy of Representation**

12     Adequacy of representation requires that "representative

13 parties will fairly and adequately protect the interests of the

14 class."  Fed. R. Civ. P. 23(a)(4).  In order for plaintiffs to

15 adequately represent the putative class members, they must

16 demonstrate, first, that they do not possess any conflicts of

17 interest with the class members and, second, that both plaintiffs

18 and their counsel will work to "prosecute the action vigorously"

19 with respect to the entire class.  Stanton, 327 F.3d at 957.

20     Here, there is no serious dispute as to either part of the

21 analysis.  There is no purported conflict of interest between

22 Campbell and Sobek, on the one hand, and the putative class

23 members, on the other.  Turning to the second part of the analysis,

24 a key consideration is the competency of counsel.  Hanlon, 150 F.3d

25 1020. Plaintiffs' counsel has ample experience in California wage-

26 and-hour class action suits.  Kershaw Decl.  ¶ 2, Ex. 1.

1  Additionally, both of the named plaintiffs have participated in the

2  litigation process -- a relevant factor to determining adequacy of

3  representation.  See Sepulveda, 237 F.R.D. at 244.  The court

4  therefore finds that plaintiffs satisfy the adequacy of

5  representation requirement.

6  **B. Requirements under Rule 23(b)(3)**

7       In addition to the requirements set forth in Rule 23(a),

8  plaintiffs must also satisfy one of the requirements set forth in

9  Rule 23(b).  Here, plaintiffs seek certification pursuant to Rule

10 23(b)(3), which requires that common questions of law or fact

11 "predominate over any question affecting only individual members"

12 and that a class action be "superior to other available methods for

13 the fair and efficient adjudication of the controversy." Fed. R.

14 Civ. P. 23(b)(3). As with the other components of the class action

15 inquiry, the court's function is not to pass on the merits. Eisen,

16 417 U.S. at 178.

17      **1. Predominance**

18      The predominance requirement "tests whether proposed classes

19 are sufficiently cohesive to warrant adjudication by

20 representation." Hanlon, 150 F.3d at 1022 (internal quotation

21 marks omitted). The inquiry "presumes that the existence of common

22 issues of fact or law have been established pursuant to Rule

23 23(a)(2)." Id. "'When common questions present a significant

24 aspect of the case and they can be resolved for all members of the

25 class in a single adjudication, there is clear justification for

26 handling the dispute on a representative rather than on an

1  individual basis.'"[5]   Id.   (quoting 7A Wright & Miller, Federal

2  Practice & Procedure § 1778 (2d ed. 1986)).

3      Defendant argues that three exemptions -- professional,

4  administrative, and executive -- may apply to each proposed class

5  member.  The court first discuses the requirements unique to each

6  exemption, and then separately addresses the requirement common to

7  all three exemptions regarding the exercise of independent judgment

8  and discretion.  The latter requirement is arguably the single most

9  important issue, because it is required for every exemption.  In

10  other words, if an employee does not exercise independent judgment

11  and discretion, then that employee is not exempt from overtime,

12  regardless of whether other exemption requirements may be

13  satisfied.

14              **a. Requirements Unique to Each Exemption**

15                     **i. Professional Exemption**

16      Plaintiffs first argue that common proof can establish that

17  no class member is entitled to the professional exemption.[6]  This

18  common proof consists of the nonexistence of a CPA license from

19  

20      [5] Though predominance may be marginal, actions addressing what
are, in reality, several individual claims may not be practically
21  pursued unless a class action is authorized.  Indeed, such may be
true in the instant case.
22  

23      [6] Section 515 of the California Labor Code states, "[t]he
Industrial Welfare Commission may establish exemptions from the
24  requirement that an overtime rate of compensation be paid."  The
regulation for the professional exemption is found in Wage Order
No. 4-2001, which governs "PROFESSIONAL, TECHNICAL, CLERICAL,
25  MECHANICAL AND SIMILAR OCCUPATIONS."  The same regulation is also
published in the California Code of Regulations at title 8, section
26  11040.

1  the State of California for each member of the class.  It is true

2  that, with respect to one avenue for satisfying the requirements

3  of the professional exemption, a license is required.  Cal. Code

4  Regs., tit. 8., § 11040(1)(A)(3) (exemption applies to those who

5  are licensed or certified in the practice of law, medicine,

6  dentistry, optometry, architecture, engineering, teaching, or

7  accounting).[7]

8      This is not, however, the only avenue for satisfying the

9  requirements of the professional exemption.  The exemption

10 provides for two separate avenues: the first (the professional

11 exemption) applies to employees who are duly licensed or

12 certified, whereas the second (the learned professional

13 exemption) applies to those who are "primarily engaged in an

14 occupation commonly recognized as a learned or artistic

15 

16     [7] The exemption provides:

17     (3) Professional Exemption

18     A person employed in a professional capacity means any
       employee who meets all of the following requirements:
19

20         (a) Who is licensed or certified by the State of
           California and is primarily engaged in the
           practice of one of the following recognized
21         professions: law, medicine, dentistry, optometry,
           architecture, engineering, teaching, or
22         accounting; or

23         (b) Who is primarily engaged in an occupation
           commonly recognized as a learned or artistic
24         profession. . . .

25 Cal. Code Regs., tit. 8, § 11040(A).  In addition, the employee
   must satisfy other requirements, such as exercise independent
26 judgment and discretion.

profession." Id. at § 11040(1)(A)(3)(b). Clearly, the proposed class cannot possibly satisfy the first avenue -- since, by definition, it only encompasses unlicensed employees. Predominance, however, is measured by the significance of the issue. Wamboldt v. Safety-Kleen Systems, Inc., 2007 WL 2409200, at *13 (N.D. Cal. 2007).

Plaintiffs argue that this second avenue (the learned professional exemption) cannot apply to the facts of this case, because it would require disregarding the specific requirements for the recognized profession of accounting in favor of the more general requirements for learned professions. The argument has great force. Defendant notes that in Piscione v. Ernst & Young, L.L.P., 171 F.3d 527, 543-46 (7th Cir. 1999), the Seventh Circuit upheld a finding that an unlicensed employee at an accounting firm qualified for the learned professional exemption based on his B.S. in Mathematics and the twenty hours of continuing education required by his employer.[8] Nonetheless, the court need not engage in detailed examination of the issue at the present juncture. Even if the learned professional exemption were applicable, it would also present a common predominant question.

To satisfy the learned professional exemption, defendant

_____

[8] Piscione did not address the threshold question of whether an unlicensed employee working in the field of accounting can qualify for the learned professional exemption, or if the non-learned professional exemption essentially preempts the field for accounting-related work. In this regard, it would be instructive to consider whether unlicensed employees working in other enumerated professions (e.g., medicine, dentistry, optometry, etc.) have been found to qualify for the learned professional exemption.

would need to prove that the class members are primarily engaged in an "occupation commonly recognized as a learned or artistic profession" (as distinct from the non-learned professional exemption, which requires a license). Cal. Code Regs., tit. 8, § 11040(1)(A)(3)(b). A "learned or artistic profession" is defined to include "[w]ork requiring knowledge of an advanced type in a field or science or learning customarily acquired by a prolonged course of specialized instruction and study, as distinct from a general academic education and from an apprenticeship and from training in the performance of routine, manual, or physical processes." Id. at § 11040(1)(A)(3)(b)(i).

Defendant seizes upon the element of specialized instruction and study to argue that the exemption will involve individualized questions. For example, defendant notes that its education-related hiring requirements vary by division and that it offers a multitude of training courses for its employees, which are utilized to varying degrees from individual to individual. But the test considers whether an employee is "primarily engaged in an occupation commonly recognized as learned." Id. at § 11040(1)(A)(3)(b) (emphasis added). In other words, the predicate for the learned professional exemption is a qualifying occupation, not a particular individual level of educational attainment. But see Piscione, 171 F.3d at 544-45 (focusing on individual educational attainment). This inquiry presents a common question because it focuses on whether the individual is employed in a qualifying occupation.

Defendant's interpretation of the learned professional exemption, which focuses on the education and training possessed by each individual employee, cannot be reconciled with the language of the exemption. To illustrate, one component of the exemption may be satisfied by a prolonged course of specialized instruction. Accepting defendant's interpretation of the exemption would mean that an associate who takes a several month-long training course is potentially employed in "*an occupation commonly recognized as learned,*" whereas that associate's colleague down the hall who works in the same division and line of service but who takes a two-week long training course, is not employed in such "an occupation." The court cannot accept defendant's interpretation, which would embrace such inconsistent results.

Rather, the court finds that the requirements unique to the professional exemption -- setting aside, for the moment, the requirement of discretion and independent judgment -- are susceptible to common proof.

### ii. Administrative Exemption

California law also exempts employees who are primarily engaged in the "performance of work directly related to the management policies or general business operations of [their] employer or [their] employer's customers." Cal. Code Regs., tit. 8, § 11040(1)(A)(2)(a)(i). Employees who work as advisors and consultants to an employer's customers may qualify for the

administrative exemption.  <u>See</u> Former 29 C.F.R. § 541.205(d).[9]

In order to qualify for the exemption, the work must be directed

to "matters that involve policy determinations, i.e., how a

business should be run or run more efficiently, not merely

providing information in the course of the customer's daily

business operations."  <u>Bratt v. City of Los Angeles</u>, 912 F.2d

1066, 1070 (9th Cir. 1990).  The regulations interpreting the

Wage Orders expressly contemplates that "many persons employed

as advisory specialists and consultants of various kinds

[including] . . . tax experts" may qualify for the exemption.[10]

_____

[9] These regulations have been revised under federal law but
the Wage Orders adopted these regulations as effective on the date
the Wage Orders were adopted.   Cal. Code Regs., tit. 8, § 11040
("The activities constituting exempt work and non-exempt work shall
be construed in the same manner as such terms are construed in the
following regulations under the Fair Labor Standards Act effective
as of the date o this order . . .").  These former regulations are
therefore the legally relevant ones.   A copy of the former
regulations can also be found in the current California Division
of Labor Standards Enforcement (DLSE) Manual.

[10] In light of this fact, plaintiffs' reliance on the
administrative/production worker dichotomy is less than helpful.
Plaintiffs argue that the dichotomy distinguishes between (a)
employees whose duties directly relate to the management policies
or general business operations of its clients versus (b) those
employees whose duties relate to producing the commodity (whether
goods or services) that the enterprise exists to produce and
market.  <u>See</u> <u>Nordquist v. McGraw-Hill Broadcasting Co.</u>, 32 Cal.
App. 4th 555, 563 (1995); <u>Dalheim v. KDFW-TV</u>, 918 F.2d 1220, 1230
(5th Cir. 1990).  But the example of a tax consultant, which the
regulations list as an example of one who qualifies for the
administrative exemption, blurs that dichotomy.  The tax
consultant's work directly relates to the client's business
operations, but the tax consultant's duties also relate to
producing the commodity of his or her enterprise, tax advice.
Similarly, an auditor's work directly relates to the client's
business operations, but the commodity of the auditor's enterprise
is audit advice.

Former 29 C.F.R. § 541.205(c)(5); id. at § 541.205(c)(2) ("[A] tax consultant . . . is ordinarily doing work of substantial importance to the management or operation of a business.").

Here, plaintiffs contend that, for two reasons, "no unlicensed associate within PwC spends more than 50 percent of his or her time providing advice to PwC's clients on matters of significance." Reply at 14. First, plaintiffs argue that the rules of independence governing the accounting profession prohibit even licensed professionals from functioning as administrators of a customer's business. But, as even plaintiffs' expert admitted, these rules do not prohibit licensed professionals from providing advice or making recommendations "to assist the client's management in performing its functions and making decisions." Carradero Decl., Ex. 3, Ueltzen Dep. 111:8-114:12 (agreeing with opinion rendered by defendant's expert); see also Decl. of John Toriello ¶ 12 (drafting memorandum to evaluate client's position of keeping separate financial statements for itself and a company in which it had fifty percent ownership). The regulations make clear that those who give advice, such as consultants, may qualify for the administrative exemption.

Second, plaintiffs note that PwC's company policy directs who may and may not sign various documents, letters, and reports -- the effect of which is to limit giving direct advice to clients to those above the senior associate level. Because this policy is not only relevant to determining whether PwC associates

and senior associates are performing work directly related to their client's general business operations under the administrative exemption, but also whether the class members exercise discretion and independent judgment, it is discussed below in that latter context.

### iii. Executive Exemption

PwC also argues that application of the executive exemption will require case-by-case analysis. The executive exemption requires, among other things, that an employee: (1) manage a customarily recognized department or subdivision thereof; (2) customarily and regularly direct the work of two or more other employees; and (3) make recommendations as to the hiring or firing, and advancement, promotion, or change of status of other employees that carry particular weight. Cal. Code Regs., tit. 8., § 11040(1)(A)(1).

Here, defendant notes that many, but not all, of the proposed class members serve as the "in charge" (PwC's nomenclature) on engagements and thereby manage a team of other employees. But a team of employees assembled for a particular engagement is not a "recognized department." The California Division of Labor Standards Enforcement (DLSE) Manual cautions that "the term 'customarily recognized department or subdivision' has a particular meaning. The phrase is intended to distinguish between 'a mere collection of employees assigned from time to time to a specific job or series of jobs' and 'a unit with permanent status and function.'" DLSE Manual at § 53.3.1.

Although the question of whether a team of employees working on an engagement constitutes a "recognized department" is one on the merits, there is little dispute as to its answer. There is no evidence that the teams over which some associates may have "in charge" status are units with *permanent* status and function. Accordingly, because the executive exemption does not apply at all, it does not pose an individualized question for the class.

### b. Requirement Common to All Exemptions: Discretion and Independent Judgment

Above the court determined whether certain requirements for the professional, administrative, or executive exemptions posed individualized questions. The court has not yet addressed the requirement common to all three exemptions, however, which is whether the employees at issue "customarily and regularly exercise discretion and independent judgment." Cal. Labor Code § 515(a).

It is this requirement that requires further analysis, for clearly if the class members exercise such powers differently, class certification is suspect. The term discretion and independent judgment "implies that the person has the authority or power to make an independent choice, free from immediate direction or supervision and with respect to matters of significance." Former 29 C.F.R. § 541.207(a). "Discretion and independent judgment involves the comparison and evaluation of possible courses of conduct, and acting or making a decision after considering various possibilities." Nordquist, 32 Cal.

1  App. 4th at 564.

2      There are two potential components to whether (and how

3  often) an employee exercises independent judgment and discretion:

4  one based on the employee's actual duties and one based on the

5  employer's expectations.    As the California Supreme Court

6  explained it, both these components are problematic:

> On the one hand, if hours worked on [an exempt
> activity] were determined through an employer's job
> description, then the employer could make an employee
> exempt from overtime laws solely by fashioning an
> idealized job description that had little basis in
> reality.   On the other hand, an employee who is
> supposed to be engaged in [an exempt activity] during
> most of his working hours and falls below the 50
> percent mark due to his own substandard performance
> should not thereby be able to evade a valid exemption.

12  Ramirez v. Yosemite Water Co., 20 Cal. 4th 785, 802 (1999).

13  Accordingly, Ramirez instructed trial courts to "steer clear of

14  these two pitfalls by inquiring into the *realistic* requirements

15  of the job." Id. (emphasis in original).   "In so doing, the

16  court should consider, first and foremost, how the employee

17  actually spends his or her time. But the trial court should also

18  consider whether the employee's practice diverges from the

19  employer's realistic expectations." Id. Ramirez thus envisions

20  the synthesis of two components, one directed at the employee and

21  one directed at the employer.

22      The California Supreme Court has also clarified the import

23  of Ramirez in the class action context: an employer's realistic

24  expectations are "likely to prove susceptible to common proof,"

25  but how employees actually spend their time "has the potential

26

1   to generate individual issues."[11]    Sav-On Drug Stores, Inc. v.

2   Superior Court, 34 Cal. 4th 319, 337 (2000).  Of course, whether

3   these individual issues materialize in any particular case turns

4   on whether the job duties at issue vary from employee to

5   employee, or whether they are uniform across employees.[12]

### i. Employer's Realistic Expectations

7   Plaintiffs argue that the question of whether the proposed

8   class members exercise independent judgment and discretion can

9   be answered by common proof.  The purported common proof is PwC's

10  policy that unlicensed associates must be under the control and

11  supervision of licensed accountants, which plaintiffs contend is

12  a necessary product of the statutes and professional standards

13  governing the practice of public accountancy.  See Cal. Bus. &

14  Prof. Code § 5053 (nothing shall preclude an individual "who is

15  not a [CPA] from serving as an employee of, or an assistant to,

16  a [CPA] . . . if the employee or assistant works under the

17  control and supervision of a [CPA].").  Section 5053 and its

18  _____

19  [11] A problem with the latter requirement is that it will
20  almost always limit class actions to jobs that are precisely the
    same, and which are performed in the same manner.  Such a
21  conclusion would defeat the effect of class actions which permit
    suit in cases where unlawful conduct would otherwise go uncorrected
22  because of the limited recovery available in individual suits.

    [12] In Sav-On, for example, it appears that the duties between
23  class members did not vary significantly; rather, the only question
    was whether each task fell on the exempt or non-exempt side of the
24  ledger.  See Sav-On, 34 Cal. 4th at 330-31 ("As plaintiffs argued
    to the trial court, '[t]he only difference between Defendant's
25  declarations and Plaintiffs' evidence is that the parties disagree
    on whether certain identical work tasks are "managerial" or
26  "non-managerial."'").

1  implicit incorporation into PwC's corporate policies[13] is

2  therefore arguably instructive as to PwC's realistic expectations

3  as an employer.[14]

4      PwC also has a policy that employees should be compliant

5  with applicable professional standards. Kershaw Decl., Ex. 6 at

6  00661. Similar to Section 5053, the pertinent professional rules

7  promulgated by AICPA address generally the supervision of

8  unlicensed accounting employees. Davila Decl., Ex. I (AICPA §

9  311.11) ("Supervision involves directing the efforts of

10 assistants who are involved in accomplishing the objectives of

11 the audit and determining whether those objectives were

12 accomplished."). These rules envision, however, that the amount

13 of supervision that is appropriate varies on an individual basis.

14 "The nature and extent of supervision and review must necessarily

15 reflect wide variances in practice. The auditor charged with

16 final responsibility for the engagement must exercise seasoned

17 judgment in varying degrees of his supervision and review of the

18 work done and judgment exercised by his subordinates." Id., Ex.

19 G (AICPA § 210.03). The factors to be taken into consideration

20

21     [13] The PwC-specific policies to which plaintiffs allude are
22  those pertaining to who may sign various documents, letters, and
    reports.

23     [14] As discussed above, this is only half of the issue, because
24  the court must also consider "how the employee actually spends his
    or her time." Ramirez, 20 Cal. 4th at 802. But the notion that
25  the company rules may be disregarded must be rejected. The fact
    that in an individual case or number of cases an employee is
26  working contrary to the company's rules would not necessarily
    undermine the propriety of class certification.

1    include the complexity of the project and the qualifications of

2    the employee.  Id., Ex. I (AICPA § 311.11).

3        In order to prove that the requirement of discretion and

4    independent judgment is susceptible to common proof based on

5    these standards, plaintiffs must prevail on its argument that

6    compliance with Section 5053 and related professional standards

7    necessarily means that all unlicensed employees are performing

8    non-exempt work.  Put slightly differently, the question is

9    whether being under "control and supervision" precludes the

10   exercise of meaningful discretion and judgment.

11       Defendant relies upon a California Superior Court decision,

12   which it argues is persuasive authority for the issues presented

13   here.  Ruiz v. PricewaterhouseCoopers LLP, Case No. BC 287920

14   (Cal. Sup. Ct. December 8, 2003), involved a trio of overtime

15   lawsuits against several accounting firms, including PwC.  They

16   were brought as private attorney general suits under California's

17   Unfair Competition Law (prior to its amendment by Proposition 64,

18   which subsequently required that all representative actions

19   proceed as class actions).[15]  The plaintiff in that case, like

20   the plaintiffs here, argued that the cases were appropriate for

21   representative treatment because of Section 5053.

22       The Ruiz court noted that Section 5053 "is part of the

23

_____

24       [15]  In an earlier motion, defendant argued that Ruiz
     collaterally estopped class certification here, but the court
25   denied the motion since Ruiz was brought as a private attorney
     general suit, rather than as a class action, precluding the
26   necessity of showing "identity of issues."

Accountancy Act, which regulates the licensing and practice of accountants . . . and is not part of the Labor Code of the Wage Orders, which regulate overtime and work conditions." Id. at *5. The court characterized plaintiff's position as requiring an "illogical leap between two completely unrelated statutory schemes." Id. The court also noted that Ramirez required the court to examine "how the employee actually spends his or her time," presumably requiring an individualized inquiry. 20 Cal. 4th at 802. Finally, it held that "as a matter of common sense, exercising discretion and independent judgment is not incompatible with being under the control and supervision of someone else." Id. at 6 (noting that even high-ranking company officers are under the control and supervision of a board of directors or shareholders).

It appears to this court that there is something less than logic in refusing to recognize the relationship, for cases of this type, between the Accountancy Act and the California Labor Code. The question tendered is whether, given the limitations imposed by the Accountancy Act, defendants violated the California Labor Code in treating associates as exempt employees. Clearly, to the extent that the statutes and professional standards are implicitly incorporated into the company's rules, they bear directly on the issues tendered by this motion.

PwC's company rules prohibit the putative class members from signing their names to various documents, letters, and reports. The pertinent regulation states, however, that "[t]he fact that

1    an employee's decision may be subject to review and that upon

2    occasion the decisions are revised or reversed after review does

3    not mean that the employee is not exercising discretion and

4    independent judgment."  Former 29 C.F.R. § 541.207(e)(1).  For

5    example, an assistant to the president of a large corporation may

6    regularly reply to correspondence addressed to the president.

7    Id.  Although the president may on occasion alter or discard the

8    prepared reply and direct that another one be sent, this action

9    does not destroy the exempt character of the assistant's

10   function.  Id.  Similarly, a "management consultant who has made

11   a study of the operations of a business and who has drawn a

12   proposed change in organization, may have the plan reviewed and

13   revised by his superiors before it is submitted to the client."

14   Id. at § 541.207(e)(2).  In addition, "[t]he policies formulated

15   by the credit manager of a large corporation may be subject to

16   review by higher company officials who may approve or disapprove

17   these policies."  Id.; see also Copas v. E. Bay Mun. Util. Dist.,

18   61 F. Supp. 2d 1017, 1030 (N.D. Cal. 1999) (finding that employee

19   exercised independent judgment and discretion even though his

20   written work and reports were subject to review by supervisors).

21          Accordingly, the court finds that the fact that the work of

22   PwC associates and senior associate is subject to review is not

23   sufficient to prove that they are performing non-exempt work.

24   Nevertheless, as noted below, the court need not rely upon this

25   fact in certifying a class.  Instead, the court finds that based

26   on the similarity of duties performed by Attest associates, class

1  certification is appropriate.

2  ### ii. Employees' Actual Duties

3  Regardless of what policies an employer may establish from
4  the top-down, and regardless of what professional standards may
5  apply at an industry-wide level, what employees actually do, on
6  a day-to-day basis, is a separate matter.  For example, simply
7  because PwC does not have a policy expressly prohibiting
8  discretion and independent judgment does not mean that its
9  employees actually exercise such discretion and independent
10 judgment.  Under Ramirez, the court must inquire "first and
11 foremost" into "how the employee actually spends his or her
12 time."  20 Cal. 4th at 802.  Of course, on a motion for class
13 certification, the issue is narrower: the question is whether
14 that inquiry is susceptible to common proof.

15 Where the relevant duties performed (i.e., those that
16 arguably constitute exempt activity) vary from class member to
17 class member, many courts have found that individual issues,
18 rather than common issues, predominate.  See Jimenez v. Domino's
19 Pizza, 238 F.R.D. 241, 251 (C.D. Cal. 2006) (no predominance of
20 common question where "there were many variable[s] which affected
21 a particular manager's mix of duties"; "the predominating issue
22 in this case is the actual mix of duties worked which entails a
23 need to conduct an individual inquiry for each class member");
24 Sepulveda, 237 F.R.D. at 249 (no predominance of common question
25 where there was "voluminous evidence that there actually was a
26 great deal of variance in [assistant manager] duties"); Pfohl v.

Farmers Ins. Group, 2004 WL 554834, at *9 (C.D. Cal. Mar. 1, 2004) ("The differing job duties and the individualized inquiry to determine whether these varying duties meet the administrative exemption preclude a collective action in this case."); Perry v. U.S. Bank, 2001 WL 34920473, at *7 (N.D. Cal. Oct. 16, 2001) (no predominant common question "in light of the differences in individual job duties"); Dunbar v. Albertson's, 141 Cal. App. 4th 1422, 1431 (2006) (class treatment inappropriate where findings as to one grocery manager could not be extrapolated to 900 other grocery managers due to significant variation in work performed).

Conversely, in cases where class treatment was deemed appropriate, the job duties between the class members were similar.  In Tierno, for example, one of the cases relied upon by plaintiffs, the employer argued that the class members' job duties varied from store to store, but upon examination of the record, the court determined that "the Store Manager position at Rite Aid is, in fact, sufficiently similar from store to store in all important respects such that class treatment is appropriate in this case."  Tierno v. Rite Aid Corp., 2006 WL 2535056, at *9 (N.D. Cal. Aug. 31, 2006).  Similarly, the primary dispute between an employer and its employees may focus on how a single activity undertaken by all class members should be treated.  See, e.g., Morillion v. Royal Packing Co., 22 Cal. 4th 575 (2000) (class action by agricultural workers alleging that time spent commuting on employer's bus counted as "hours worked").

The fact that an employer classifies all or most of a particular class of employees as exempt does not eliminate the need to make a factual determination as to whether class members are actually performing similar duties.[16]  In <u>Walsh</u>, for example, the employees argued that if they could prove that the employer deliberately misclassified them as exempt, this policy would constitute a common, predominant issue, "even if individualized proof of a . . . member's work was required to evaluate whether each member's work was exempt."  <u>Walsh v. IKON Office Solutions, Inc.</u>, 148 Cal. App. 4th 1440, 1461 (2007).  The court rejected the argument:

> [Plaintiffs] assume that an employer is liable if it classifies employees without regard to the law or investigating what work they do, even if the employees were, in fact, subject to the exemption.  While such action on the part of an employer may be 'deliberate' and 'willful,' [which might be relevant for waiting time penalties] it is not 'misclassification.'
>
> In other words, [plaintiffs] cannot recover under Labor Code section 1194 unless the Account Manager Subclass members were not, in fact, subject to the outside salesperson exemption; that determination requires consideration of the individual circumstances of each Account Manager Subclass member.

<u>Id.</u>

Some courts, however, have determined that it is unfair for

---

[16] One court has noted that a "[d]efendant's initial, uniform classification . . . has only minimal relevance to the facts that ultimately must be determined at trial."  <u>Vinole v. Countrywide Home Loans, Inc.</u>, 246 F.R.D. 637, 641 (S.D. Cal. 2007).  Proving a uniform classification is akin to proving the element of standing: naturally, an employee must have been classified as exempt to bring a misclassification claim.  But once that initial hurdle is cleared, the case will ultimately turn on whether the employee was *wrongly* classified as exempt.

1   an employer to "on the one hand, argue that all [class members]

2   are exempt from overtime wages and, on the other hand, argue that

3   the Court must inquire into the job duties of each [class member]

4   in order to determine whether that individual is 'exempt.'" See,

5   e.g., Wang v. Chinese Daily News, 231 F.R.D. 602, 613 (C.D. Cal.

6   2005).  But, under Walsh, there is no estoppel effect given to

7   an employer's decision to classify a particular class of

8   employees as exempt -- whether right or wrong, or even issued in

9   bad faith; instead, the only legally relevant issue to alleged

10  misclassification is whether the exemption in fact applies.[17]  If

11  the duties between class members are similar, the exemption

12  inquiry is likely susceptible to common proof, e.g., Tierno, 2006

13  WL 2535056, at *9, but if the duties are not sufficiently

14  similar, then the inquiry is unlikely to be susceptible to common

15  proof, e.g., Jimenez, 238 F.R.D. at 251.

16      Here, both parties have submitted evidence pertaining to the

17  job duties performed by class members.  Plaintiffs have submitted

18  two employee declarations (their own) and defendant has submitted

19  _____

20      [17] It may be intuitively unfair to permit an employer, who has
    historically classified a particular group of employees as exempt

21  based on a uniform rule, to argue in the context of litigation that
    the exemption inquiry will require an individualized analysis.  But

22  the assumption behind such an intuitively appealing argument is
    that an employer should somehow be bound by its prior position --

23  which is foreclosed by Walsh.  "[I]n resolving questions of
    California law, this court is bound by the pronouncement of the

24  California Supreme Court . . . and the opinions of the California
    Courts of Appeal are merely data for determining how the highest

25  California court would rule . . . [but] the opinion of the Court
    of Appeals on questions of California law cannot simply be

26  ignored." Brewster v. County of Shasta, 112 F. Supp. 2d 1185, 1188
    n.5 (E.D. Cal. 2000) (internal quotation marks omitted).

approximately fifty employee declarations (from a mix of associate, senior associate, and higher-level employees). The Campbell and Sobek declarations state that their "daily activities involved assisting CPAs in performing audits for PwC's clients" and that "[e]very audit was essentially performed in the same way." Campbell Decl. ¶ 6; Sobek Decl. ¶ 6. They also describe how their duties were prescribed by the "audit plan," a computerized program with a list of financial statement items that needed to be verified. Id. Sobek and Campbell both stated that neither they nor "any other associate or senior associate had the authority to prepare or deviate from the audit plan." Sobek Decl. ¶ 8; Campbell Decl. ¶ 8.

Crucially, however, their personal knowledge appears limited, in large part, to one division (Attest) within one line of service (Assurance).[18] But there are other divisions within Assurance in addition to Attest: Systems Processing Assurance and Transactional Services. Campbell testified during his deposition that he did not know much about the job duties of associates in these other two divisions. Campbell Dep. 22:22-23:2.[19] Sobek's

---

[18] This issue is also raised in defendant's motion to strike. The court discusses the relevant issues raised by that motion but finds that the arguments primarily go to the weight of the evidence rather than its admissibility.

[19] "Q. Do you know what associates do in the [Transactional Services] division?
A. No, I do not.
Q. Do you know what associates do in the [Systems Processing Assurance] division do?
A. Specifically, no, I do not."

testimony was slightly more informed than Campbell's on this issue, but she too only possessed general information. Sobek Dep. 229:19-230:6; 231:4-7.[20]  With regard to the duties performed by associates in the Tax line of service, Sobek and Campbell said that the associates help to perform tax returns, but could not offer any specific details whatsoever.[21]  Campbell Dep. 22:11-21; Sobek Dep. 230:7-13.

PwC has submitted a small mountain of declarations.  Upon review, two consistent findings emerge, both of which dovetail with the limitations in Sobek and Campbell's testimony.  First, they attest to significant differences in the work performed between divisions and between lines of services.  Some employees work on IT, some work on tax returns, some work on reviewing quarterly and year-end reports, some work on transactions, and some work audits.  See, e.g., Majstrova Decl. ¶ 5; Dang Decl. ¶ 7; Wilson Decl. ¶ 7.  Whether framed as an issue of typicality under Rule 23(a)(3) or predominance under Rule 23(b)(3), the court finds that certification would be improper if not limited to the Attest division where plaintiffs actually worked.

Second, it appears that there is a meaningful distinction

---

[20] "Q. Do you know what the duties were of a [Systems Processing Assurance] associate, generally?
A. They basically did SAS-70 type work, the controls.  I'm not sure.  That's all I knew of them."

[21] Of course, plaintiffs need not personally possess such information, but Campbell and Sobek's depositions and declarations are the only pieces of evidence submitted by plaintiffs on the duties performed by PwC associates and senior associates.

between associates and senior associates' duties.  A significant if not primary responsibility for senior associates is to review the work of associates.  <u>See, e.g.</u>, Gomez Decl. ¶ 11 ("When I became a Senior Associate, I spent about 50% to 60% of my time reviewing the work of other Associates."); Decl. of Ryann Lucas ¶ 17 ("As an associate, I spent 50% of my time on an engagement preparing the documentation, whereas as a Senior Associate, I spent less time preparing (no more than 30%) and more time reviewing the work of others.").  Senior associates also tend to spend more time helping to prepare the audit plan, interacting with clients, and communicating with PwC managers and partners.  <u>See, e.g.</u>, Decl. of Michael Anderson ¶¶ 8-9.  The question is whether these duties potentially involve the exercise of independent judgment such that the inclusion of senior associates would render class treatment inappropriate.  Under the circumstances, there does seem to be a sufficiently significant difference between associates and senior associates to warrant exclusion of the latter group from the class.

Although there is also some evidence of variation in the duties performed by associates within the same division, the duties are nevertheless sufficiently similar to warrant class treatment.  For example, it appears that many Attest associates test the client's "internal controls," such as the requirement that checks be signed by someone other than the person who draws it.  Decl. of Ashlee Pierce ¶ 10; Decl. of Blair Krebs ¶ 11.  Similarly, many Attest associates perform "detail testing," in

1  which a sample of items from major account balances is selected

2  and a search of hard evidence of those items is performed.  Decl.

3  of Denise McCurry ¶ 16; Decl. of Michael McCarvel ¶ 11.  Based

4  on the similarities in duties performed by Attest associates, the

5  court finds that there is a common, predominant question of law

6  or fact.  <u>Cf.</u> <u>Tierno</u>, 2006 WL 2535056, at *9.

7           **c. Other Claims**

8      Plaintiffs also allege a host of claims that are derivative

9  of, or dependent upon, a finding that PwC misclassified its

10 employees.[22]  Although the parties dispute whether each of these

11 claims presents individualized or common issues, even in the

12 aggregate these claim are not particularly significant.  Rather,

13 the key issue upon which certification must rise or fall is

14 whether common questions of law or fact predominate in the main

15 exemption inquiry.

16          **2. Superiority of Class Resolution**

17     Rule 23(b)(3) also requires that class resolution be

18 "superior to other available methods for the fair and efficient

19 adjudication of the controversy."  The relevant inquiry is

20 determined by analyzing the four factors in Rule 23(b)(3)(A-D).

21 <u>Hanlon</u>, 150 F.3d at 1023.  Most these factors indicate that class

22 resolution is a superior method in this case.

23     First, "the interest of members of the class in individually

24

25      [22] These include, for example, waiting time penalties, Cal.
   Labor Code § 203, wage statement claims, Cal. Labor Code § 226, and
26 meal and rest break claims, Cal. Labor Code §§ 512(a) & 226.7.

1    controlling the prosecution or defense of separate actions" must

2    give way to two competing concerns: the reality that class

3    members may fear reprisal in pursuing individual claims against

4    their employer, and the fact that individual litigation against

5    a well-funded defendant would be cost prohibitive. See Scott v.

6    Aetna Servs., Inc., 210 F.R.D. 261, 268 (D. Conn. 2002).

7        Second, "the extent and nature of any litigation concerning

8    the controversy" is not a concern, as neither party has

9    identified any related, pending litigation.

10       Third, "the desirability or undesirability of concentrating

11   the litigation of the claims in this particular forum" does not

12   weigh heavily on either side.

13       Fourth, although there may be manageability issues, they are

14   significant only if they create a situation that is less fair and

15   efficient than other available techniques.  In re Sugar Industry

16   Antitrust Litigation, 73 F.R.D. 322, 358 (E.D. Pa. 1976).

17   Manageability concerns must be weighed against the alternatives

18   and "will rarely, if ever, be in itself sufficient to prevent

19   certification of a class."  Klay v. Humana, Inc., 382 F.3d 1241,

20   1272 (11th Cir. 2004).

21       Accordingly, the court finds that the requirements of Rule

22   23(b)(3) are satisfied here.

23                           **IV. Conclusion**

24       For the reasons set forth above, the court GRANTS the motion

25   with respect to Attest associates but DENIES the motion with

26   respect to senior associates and non-Attest associates.

                                    42

1    The court notes that the above determination is one

2  involving a controlling question of law and there is substantial

3  ground for difference of opinion and that an immediate appeal

4  from the order will materially advance the ultimate termination

5  of the litigation.

6    ACCORDINGLY, the court certifies the matter for

7  interlocutory appeal pursuant to 28 U.S.C. § 1292.[23]

8    IT IS SO ORDERED.

9    DATED:  March 24, 2008.

10

11

12                          LAWRENCE K. KARLTON
13                          SENIOR JUDGE
                            UNITED STATES DISTRICT COURT
14

15

16

17

18

19

20

21

22

23

24

25
_____
      [23] The court also calls the parties' attention to Federal Rule
26  of Civil Procedure 23(f).

43